**MYERS et al., Appellants,**

v.

**RILEY et al., Appellees.**

[Cite as *Myers v. Riley* (1994), 98 Ohio App.3d 133.]

Court of Appeals of Ohio,
Huron County.

No. H–93–032.

Decided Oct. 14, 1994.

134

*James E. McGookey,* for appellants.

*Donald E. Theis,* for appellees.

---

*Per Curiam.*

Appellants, David D. Myers and Michael P. Pleska, filed this appeal from a July 13, 1993 decision and judgment entry of the Huron County Court of Common Pleas in which the court ruled that it had no jurisdiction to consider tort claims filed by appellants against appellees Timothy J. Riley, Huron County Engineer,[1] John Brooks, Administrative Assistant to the Huron County Engineer, and the Commissioners of Huron County, Ohio. The Huron County Court of Common Pleas also stated that even if jurisdiction did exist in that court, appellants failed to show that the conduct of appellees was outrageous, so appellees were entitled to summary judgment on the claim for intentional infliction of emotional distress.

Appellants filed a complaint against appellees in the Huron County Court of Common Pleas on July 21, 1992. The complaint contained allegations that appellees had engaged in behavior which resulted in their liability for causes of action for intentional infliction of emotional distress, bad faith, prima facie tort, conspiracy, and violation of appellants' constitutional rights. Appellants sought

---

1. Appellee Riley lost a re-election bid and no longer holds the office of Huron County Engineer. Appellee Brooks is no longer the Administrative Assistant of the Huron County Engineer. However, for purposes of clarity and brevity, we will refer to the appellees by the titles they held at the time the events occurred which gave rise to this case.

actual damages, punitive damages, an injunction, prejudgment interest, attorney fees, and payment of costs. Appellants also filed a motion for a preliminary injunction to prevent appellees from harassing appellants.

Appellees responded to the complaint and to the motion for a preliminary injunction by filing a motion to dismiss and/or a motion for summary judgment. Appellees argued that the case should be dismissed because the claims brought by the appellants were "controlled and governed by" a collective bargaining agreement.

On September 10, 1992, the Huron County Court of Common Pleas filed a judgment entry denying the motion for a preliminary injunction. On September 15, 1992, a second decision and judgment entry was filed in which the court ruled that the "action should not be dismissed and that the record herein is not sufficient at this time to grant a summary judgment."

Both parties conducted discovery in the case, and the deposition testimony of several witnesses was filed. In addition, affidavits and other exhibits were filed.

On July 13, 1993, the trial court filed a decision and judgment entry in which it ruled that, pursuant to R.C. Chapter 4117, the court had no jurisdiction to consider any of the claims and causes of action asserted by appellants. The trial court further ruled that appellees were entitled to summary judgment in the entirety, noting that appellants failed to show the conduct of appellees was outrageous.

Appellants filed a notice of appeal on August 11, 1993, and have presented two assignments of error for our consideration. The assignments of error are:

"Assignment of Error No. 1: The court erred in concluding that it did not have jurisdiction over the claims presented in this action and in granting summary judgment on that basis.

"Assignment of Error No. 2: The court erred in granting summary judgment upon the claim for intentional infliction of emotional distress based upon its conclusion that defendants' conduct was not 'outrageous'."

We begin by noting that while the decision and judgment entry of the trial court was styled by the trial court as a grant of summary judgment to appellees, the order was in reality a dismissal of the case on the grounds that the trial court did not have subject matter jurisdiction, and therefore the entry could not be a grant of summary judgment, since the trial court concluded that the merits of the case could not be reached. Our consideration of the case, therefore, will consist of our reviewing the facts that are established by the record and the law in this state to determine whether those facts show that the trial court lacked subject matter jurisdiction.

The record shows that at the time the events giving rise to this case occurred, appellants were employees working for the Huron County Engineer. Appellant Myers worked in a janitorial capacity, and appellant Pleska worked as a mechanic. Appellant Myers asserts that difficulties began for him at the workplace when he appeared as a witness on behalf of a fellow employee, who was charged with excessive use of sick time, and who was facing disciplinary action from the Huron County Engineer. The result of the hearing was a finding that the charged employee had not abused his use of sick time.

Shortly after the disciplinary hearing was conducted, the Huron County Engineer served notice on two employees that he planned to lay them off from work. One of the employees who received the notice was the employee who had been charged with excessive use of sick time. Appellees testified in their depositions that the employees who received notices were chosen on the basis of budgetary considerations. Appellees stated that many bridges were in need of repair and replacement, and they were trying to find ways to allocate more money to those repairs. The two employees who received layoff notices had higher salaries than many of the other employees, and appellees contended that they planned to reallocate the money used for salaries of the two employees to repair projects.

Both of the employees who originally received layoff notices exercised seniority rights and "bumped" appellants from their employment positions. Appellants challenged their layoffs through the State Personnel Board of Review ("SPBR") and won a ruling that the layoffs were unjustified, after appellants showed that there was a large sum of money available to appellees for repairs that had not yet been appropriated by appellees. Appellees did not honor the SPBR ruling and refused to reinstate appellants. Appellants then filed a mandamus against appellee Riley in this court. This court ruled in favor of appellants and ordered appellee Riley to reinstate appellants to their employment with back pay, credit for vacation time, and to pay appellants' attorney fees.

Appellees did not immediately comply with all of the orders of this court, and appellants filed an action to require appellee Riley to show cause why he should not be held in contempt. Appellee Riley thereafter did comply with all of the orders previously issued by this court.

Appellant Myers stated that upon his return to work, appellees engaged in a campaign of harassment, which consisted of assigning him work which provided no benefit to the county engineer, and of requiring him to do the work without any power tools or equipment. He testified that on his first day back to work, he was assigned the task of cleaning out a catch basin in the outside sewer system. He testified that before he was laid off by appellees, he was allowed to use all of the power tools and equipment from the garage. He testified that upon his

return, he was informed that he could not use any power tools or equipment. He therefore cleaned the catch basin out by using a shovel and a bucket tied to the end of a rope, which he lowered into the basin to remove collected water.

Appellees contended that they did not engage in a campaign to harass appellant Myers. They stated that since one individual was able to efficiently do all of the work which was done by appellant Myers and a second worker before appellant Myers was laid off, they decided not to split the assignment again when appellant Myers returned to work, but chose to compile a list of low priority jobs which needed to be done and to assign appellant Myers to those jobs. While they agreed the jobs were low priority, they stated that the jobs did eventually need to be done, and some benefit was derived by the county engineer from their completion. They stated that they were forced to "make work" for appellant Myers when SPBR and this court ordered his return to employment.

As to the complaint that appellant Myers could use equipment and power tools before his layoff, but not after his return, appellees testified that between the time of the layoff of appellant Myers and the time of his return to his job as a janitor, a union began representing the employees. A collective bargaining agreement was formed, which governed job descriptions and duties. The job description for appellant Myers's position did not include the use of equipment. Appellees stated that appellant Myers was still allowed the use of small power tools, such as hand drills or lawn mowers, pursuant to the new job description, but stated they did not believe he needed any power tools to accomplish the task of cleaning the catch basin. They conceded that a sump pump had previously been used to clean standing water from a clogged catch basin, but stated that when a catch basin operated properly, there was no water to remove. They testified that they did not receive any report that the catch basin appellant Myers cleaned had standing water, and that other employees whose job descriptions allowed them to use equipment and power tools could have assisted appellant Myers by setting up a sump pump if he had asked.

Appellant Myers testified that the next assignment he was given, after cleaning the catch basin, was to dig a hole which measured exactly five feet by five feet by four feet, using nothing but a pick and a shovel. He testified that it took him three days to complete the assignment. He notified his supervisor that the hole was done, took the supervisor to the hole, measured it to show it met the required specifications, and was then told to fill the hole back in at once.

Appellees conceded that the same hole could have been done in five minutes if it was dug with power equipment, such as a backhoe. Both appellees testified that the purpose for digging the hole was to take a soil sample, to see if there was any ground contamination in the area, because appellant Myers had reported finding a slick substance in the catch basin when he cleaned it, and there were

other known spots in the yard of the garage where kerosene leaks had caused ground contamination. The "soil sample" was taken from the dirt that was piled next to the hole, and was placed in a covered jar. The sample was never sent for testing because appellees could not detect any odor of kerosene coming from the soil when the cover was removed from the jar. No explanation was offered by appellees relating to the specific measurement requirements of the hole, but appellee Riley did concede that part of the motivation for assigning appellant Myers to dig the hole was "disciplinary," to teach him to follow the policies and procedures of the department.

As soon as the first hole was filled back in, appellant Myers was told to dig a second hole, with the same dimensions, in another area of the yard where liquid asphalt had been spilled. Again, appellant Myers was directed to dig the hole using only a pick and a shovel. Appellant Myers worked on the second hole for half a day, became sick, and was sent home.

The deposition testimony of appellants and appellees reveals that the local newspaper ran articles about the hole-digging assignments given to appellant Myers. Some members of the public picketed outside the facilities of the county engineer to protest the assignments. In addition, the county prosecutor sought an order from the court of common pleas barring the county engineer from requiring any further work on the holes.

When appellant Myers recovered from his sickness and returned to work, he was not directed to complete the second hole. No one was ever assigned to finish digging the second hole. Instead, appellant Myers was assigned the task of painting the inside of the garage.

He testified that he was given a four-inch brush to use to complete the painting assignment. He sought permission to use a paint roller to make the job easier and to speed completion of the project, but his request was denied. He also sought permission to use a paint sprayer system owned by the county engineer, but once again his request was denied. Because he was not allowed to operate equipment, he had to seek help from other employees to move trucks and other machinery from the area he was painting. Frequently, the other employee who actually moved the machinery was another janitor who had the same job classification and job description as appellant Myers. Testimony from the depositions of appellant Myers and from appellees shows that it took appellant Myers several months to finish painting the garage.

Appellees testified that they denied the request to use the paint sprayer system because they were afraid the paint would drift through the air as a mist, and would not be applied only to the walls of the garage. They stated that the request for the use of a roller was denied because appellant Myers had used a paint roller to apply paint to the cement block walls in the office area of the

garage, and the paint did not cover the blocks well. Since the rest of the garage was also made of cement blocks, they believed the only way to get good paint coverage was to apply the paint with a brush. They testified that appellant could have any size brush he requested, and that he was not limited to the use of a four-inch brush.

Appellant testified, at a hearing conducted in the trial court relating to a request for an injunction, that he became sick from the stress caused by the events at work, and that he sought treatment from his medical doctor for physical problems caused by the stress, which resulted in his being prescribed medication for his nerves. In addition, appellant supplied his affidavit to support his memorandum in opposition to appellees' motion for summary judgment, in which he stated that his personal relationships had been disrupted because of the stress he experienced at work, that he had trouble sleeping, and that he lost weight. He also submitted progress notes from the file of a psychologist, which showed that he sought counseling for the stress caused by his situation at work from October 9, 1992 until January 29, 1993.

Appellees argue that appellant Myers did not seek medical treatment for several months after his return to work, and that he did not seek treatment from a psychologist until after this case was filed and a motion to dismiss and a motion for summary judgment were filed by appellees. Appellees contend that appellant Myers's claims of physical and emotional injury are exaggerated.

The harassment cited by appellant Pleska, which he asserts resulted in his severe emotional distress, related to his work uniform. Appellant Pleska testified at the hearing that when he returned to work after the layoff, he did not have a uniform from the county to wear at work. He testified that he instead wore his own freshly laundered work clothes. He acknowledged that his work clothes had grease stains on them, but contends they were old stains that were not removed when he laundered the clothes. He was called to the assistant administrator's office, and was given an oral warning, which was included in writing in his personnel file, that if he continued to wear dirty clothes to work, he would be suspended from work without pay. When he did receive a county uniform, the pants were too large. He had to tie a rope around his waist to keep the pants from falling, and had to roll the pants up several inches to shorten the length of the pant leg. He provided an affidavit stating that he was caused great emotional distress by the problems associated with his uniform, and that he had taken aspirin and stomach medicine to treat physical symptoms caused by the stress.

Appellees respond that the work clothes worn by appellant Pleska when he was disciplined were not freshly laundered. They contend that in addition to old stains, the clothes were dirty. Appellees acknowledge that the uniform initially

received for appellant Pleska were too large. They acknowledge that he had to roll up the pant legs and had to wear a rope around his waist to hold the pants up, until new uniforms that fit were shipped two months later. Appellees argue that other employees also had to wear ill-fitting uniforms for a time, until errors made in the placement of the order for uniforms were corrected. Finally, appellees argue that appellant Pleska has failed to show that he suffered any severe emotional distress.

The record shows that both appellant Myers and appellant Pleska filed grievances, relating to the above events, through the procedure established in the collective bargaining agreement. Appellant Myers filed grievances relating to the hole-digging assignments, relating to management's orders preventing him from using power tools, and relating to disputes over withheld pay and over alleged gambling activities he may have been a part of at the work place. Appellee Pleska filed a grievance over the disciplinary action taken against him for wearing soiled clothing to work. The record shows that appellees denied all of the filed grievances, and the union appealed the denials by following the procedures outlined in the collective bargaining agreement.

Appellants contend, in their first assignment of error, that the trial court erred when it ruled that it lacked subject matter jurisdiction to consider the claims and causes of action presented by appellants in their complaint. Appellees respond that the trial court was correct when it determined it had no subject matter jurisdiction in this case. At issue is whether the existence of a collective bargaining agreement containing a binding arbitration clause precludes appellants from obtaining any remedy other than the binding arbitration.

Appellants and appellees agree that R.C. Chapter 4117 relates to collective bargaining by public employees, a fact this court previously acknowledged when we stated: "R.C. Chapter 4117 created a comprehensive system for the regulation of collective bargaining." *Mueller v. Toledo* (Mar. 31, 1993), Lucas App. No. L–91–421, unreported, 1993 WL 93492. However, appellants and appellees disagree about the applicability of R.C. Chapter 4117 to the facts in this case.

Appellees contended in the trial court and on appeal that the tort claims presented by appellants are in reality allegations of conduct that is arguably an unfair labor practice, and that the provisions of R.C. Chapter 4117 apply to give the State Employment Relations Board ("SERB") exclusive jurisdiction over the issues raised. Appellees also argue that the provisions of R.C. 4117.10(A) apply to establish binding arbitration as the sole remedy available to appellants for any disputes which arise from issues covered by the collective bargaining agreement.

Appellants contend that the claims they raise are not arguably unfair labor practices, so SERB does not have exclusive jurisdiction over the claims. Appellants also contend that they are not limited to binding arbitration as a sole

remedy, because their tort claims do not arise out of the collective bargaining agreement.

▇ R.C. 4117.11 contains a list of activities that can be labeled as unfair labor practices if they are engaged in by an employer. R.C. 4117.11 provides in pertinent part:

"(A) It is an unfair labor practice for a public employer, its agents, or representatives to:

"(1) Interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Chapter 4117. of the Revised Code or an employee organization in the selection of its representative for the purposes of collective bargaining or the adjustment of grievances;

"(2) Initiate, create, dominate, or interfere with the formation or administration of any employee organization, or contribute financial or other support to it; except that a public employer may permit employees to confer with it during working hours without loss of time or pay, permit the exclusive representative to use the facilities of the public employer for membership or other meetings, or permit the exclusive representative to use the internal mail system or other internal communications system;

"(3) Discriminate in regard to hire or tenure of employment or any term or condition of employment on the basis of the exercise of rights guaranteed by Chapter 4117. of the Revised Code. Nothing precludes any employer from making and enforcing an agreement pursuant to division (C) of section 4117.09 of the Revised Code;

"(4) Discharge or otherwise discriminate against an employee because he has filed charges or given testimony under Chapter 4117. of the Revised Code;

"(5) Refuse to bargain collectively with the representative of his employees recognized as the exclusive representative or certified pursuant to Chapter 4117. of the Revised Code;

"(6) Establish a pattern or practice of repeated failure to timely process grievances and requests for arbitration of grievances;

"(7) Lock out or otherwise prevent employees from performing their regularly assigned duties where an object thereof is to bring pressure on the employees or an employee organization to compromise or capitulate to the employer's terms regarding a labor relations dispute;

"(8) Cause or attempt to cause an employee organization, its agents, or representatives to violate division (B) of this section."

A careful review of all the testimony presented in this case shows that none of the allegations raised fit into the criteria established by R.C. 4117.11 for unfair labor practices by an employer. Appellants did not allege that appellees prohibited appellants from organizing a union; did not allege that appellees interfered with union activities and functions; did not allege that they were discriminated against as to hiring or tenure because of being associated with a union; did not allege that they were retaliated against for offering testimony in a proceeding established under the collective bargaining rights established in R.C. Chapter 4117; did not allege that appellees refused to bargain with the union chosen by the employees; did not allege that appellees had a pattern of failing to timely process grievances; did not allege that appellees had locked appellants out of their place of work to compel them to compromise or capitulate to demands made by appellees in a labor dispute; and did not allege that appellees endeavored to cause appellants or their representatives to engage in conduct that would constitute an unfair labor practice pursuant to R.C. 4117.11(B). Accordingly, appellees' contention that SERB has exclusive jurisdiction to determine the issues raised in this case and the citation to case law supporting the rule of law that SERB has exclusive jurisdiction to consider cases involving unfair labor practices, see, *e.g., Gunn v. Euclid City School Dist. Bd. of Edn.* (1988), 51 Ohio App.3d 41, 43, 554 N.E.2d 130, 132; *State ex rel. Ramsdell v. Washington Local School Bd.* (1988), 52 Ohio App.3d 4, 6–7, 556 N.E.2d 197, 199–200, is unpersuasive.

We next consider appellees' contention that R.C. 4117.10(A) must be applied in this case to limit appellants solely to binding arbitration to resolve the claims appellants raise. R.C. 4117.10(A) provides in pertinent part:

"(A) An agreement between a public employer and an exclusive representative entered into pursuant to Chapter 4117. of the Revised Code governs the wages, hours, and terms and conditions of public employment covered by the agreement. *If the agreement provides for a final and binding arbitration of grievances,* public employers, employees, and employee organizations are subject solely to that grievance procedure *and the state personnel board of review or civil service commissions have no jurisdiction to receive and determine any appeals relating to matters that were the subject of a final and binding grievance procedure.*" (Emphasis added.)

Appellees point out that the collective bargaining agreement which applies to the parties in this case does have a binding arbitration clause included under the grievance procedure provisions. Appellees argue that because the binding arbitration clause exists, appellants are precluded from seeking any relief from the courts. Appellants respond that the grievance procedure is established to give employees some recourse to protest disciplinary actions taken against employees

by an employer.  Appellants argue that the actions of appellees in this case did not constitute discipline, so the actions are not governed by the agreement.

The Supreme Court of Ohio has clearly stated that:

"If a party asserts rights that are independent of R.C. Chapter 4117, the party's complaint may properly be heard in common pleas court.  However, if a party asserts claims that arise from or depend on the collective bargaining rights created by R.C. Chapter 4117, the remedies provided in that chapter are exclusive."  *Franklin Cty. Law Enforcement Assn. v. Fraternal Order of Police, Capital City Lodge No. 9* (1991), 59 Ohio St.3d 167, 572 N.E.2d 87, at the syllabus.

Appellants contend that they have asserted claims that do not arise from the collective bargaining agreement and which are not governed by R.C. Chapter 4117.  Accordingly, we have carefully reviewed the provisions of the collective bargaining agreement to determine whether the agreement covers situations like the ones complained of by appellants.  We have also kept in mind the ruling of the Supreme Court of Ohio that:

"Public employees do not have a private cause of civil action against their employer to redress alleged violations by their employer of policies embodied in the Ohio Constitution when it is determined that there are other reasonably satisfactory remedies provided by statutory enactment and administrative process."  *Provens v. Stark Cty. Bd. of Mental Retardation & Dev. Disabilities* (1992), 64 Ohio St.3d 252, 594 N.E.2d 959, at the syllabus.

We have therefore evaluated (1) whether provisions of the collective bargaining agreement are applicable to the situations complained of by appellants, and (2) whether appellants are provided with sufficiently fair and comprehensive remedies.

Addressing the first consideration, we find several provisions in the collective bargaining agreement which must be considered.  First, we note that the agreement contains an article that outlines management rights.  The article reads in pertinent part:

"A.  Except as specifically limited by the express terms of this Agreement, the Employer retains all traditional rights to manage and direct the affairs of the Employer, including, but not limited to the right and responsibility to:

" *  *  *

"2.  Direct, supervise, evaluate, or hire employees;

" *  *  *

"4.  Determine the overall methods, process, means or personnel by which governmental operations are to be conducted;

"5. Suspend, discipline, demote, or discharge for just cause, or lay off, transfer, assign, schedule, promote or retain employees;

" * * *

"10. Establish reasonable work rules, policies and directives not inconsistent with this Agreement."

The agreement also contains provisions which outline a grievance procedure available to employees. The pertinent sections of the article relating to the grievance procedure read:

"A. The term 'grievance' shall mean an allegation by the Union or an employee that there has been violation [*sic*], misinterpretation, or misapplication of an express term of this Agreement.

" * * *

"B. Step 3(b) * * * The arbitrator shall hear and determine only one grievance at a time, except by mutual agreement. * * * In reaching his decision and his award, the arbitrator shall limit himself to the grievance presented and evidence thereto and shall not add to, subtract from, alter, modify, or ignore any of the provisions of this written Agreement, or establish wage rates not negotiated as part of this Agreement except as may be explicit to this Agreement or grant any right or relief of any alleged grievance occurring at any time other than the contract period in which such right originated. The arbitrator shall limit his decision strictly to the interpretation, application or enforcement of the specific terms of this Agreement.

" * * *

"E. The procedure contained in this Article shall constitute the sole and exclusive method of redressing grievances arising during the life of this Agreement. It is further understood and agreed that a decision at any level of the grievance procedure that is mutually acceptable to the Union and the Employer representatives shall be final and binding upon the grievant, the Union and the Employer.

" * * *

"K. The grievance procedure herein, is the sole and exclusive recourse for employees regarding issues of discipline, including discharge and specifically replaces the appeals procedure in the Ohio Civil Service Laws related thereto found under ORC 124."

A third article in the collective bargaining agreement, which merits some review, applies to assignment of work. The pertinent provision of the article reads:

"A.  Supervisors shall have exclusive control of allocating work assignments, trucks and equipment to employees."

A final article which merits review addresses the matter of discipline procedures.  The pertinent provisions of this article read:

"A.  An employee who is disciplined shall be given a written notice stating the reason for the disciplinary action within five (5) work days thereafter.  A copy of said written notice will be forwarded at the same time to the Union.

" * * *

"C.  Disciplinary action shall normally progress from oral reprimand, to written reprimand, to suspension without pay, and ultimately discharge.  Employees may be subject to discipline only for just cause."

When all of the above provisions of the collective bargaining agreement are considered together, it becomes apparent that the directives from appellees requiring appellant Myers to perform low priority jobs without any power tools or equipment did not constitute discipline under the terms of the agreement. While it is arguable that the actions are covered by the management rights article and work assignment article of the agreement, it is also apparent that no remedy exists under the agreement should an employee believe that management has exceeded the scope of its authority in making work assignments, because the terms of the agreement reserve all rights to management.  The arbitrator, therefore, cannot declare that any breach of the term occurred and has no remedy to offer for any abuse which may have occurred.

Appellant Myers's alleged injuries arise from behavior which took place at work, but the situs of the behavior does not automatically grant jurisdiction over causes of action arising from the behavior to SERB or to the arbitrator pursuant to the collective bargaining agreement.  Appellant Myers complains that he suffered emotional and physical injuries because of outrageous conduct that exceeded the normal boundaries of behavior for management.  Appellant Myers argues that even though management has a statutory right to make work assignments, see R.C. 4117.08(C)(2), (4), (5), and (8), and in this case had that authority under the collective bargaining agreement, management has no authority to act in an outrageous, tortious manner.

We conclude that appellant Myers has asserted independent causes of action, which do not arise from the collective bargaining agreement or from rights granted pursuant to R.C. Chapter 4117.  We note that the independent causes of action cannot be construed to encompass all of the behavior about which appellant Myers complained while at work, because some of the actions taken by appellees are covered by the terms of the collective bargaining agreement.

Accordingly, the trial court should not consider allegations that relate to improper withholding of holiday pay or improper denial of break time, or to actions which do fit the definition of "discipline" pursuant to the collective bargaining agreement.

Likewise, we note that one action taken against appellant Pleska by appellees does fall within the exclusive jurisdiction of the arbitrator, because the write-up for wearing soiled clothes does fall under the discipline provisions of the collective bargaining agreement. The action of requiring appellant Pleska to wear pants that were too large for him does not qualify as discipline pursuant to the collective bargaining agreement and is not covered by any other provision of the collective bargaining agreement or of R.C. Chapter 4117. Appellant Pleska has therefore asserted independent causes of action only as to his complaint regarding the requirement that he wear pants that were too large.

In addition, neither appellant has a sufficiently fair or comprehensive remedy available under R.C. Chapter 4117 or under the provisions of the collective bargaining agreement, if they demonstrate that their causes of action are meritorious. Accordingly, to the extent explained above, appellants' first assignment of error is well taken.

Our disposition of the first assignment of error leads to the conclusion that the trial court has subject matter jurisdiction to consider the causes of action asserted by appellants. However, we decline to address the merits of the second assignment of error presented by appellants. The statement of the trial court that no cause of action for emotional distress exists is not a final appealable order, because the trial court had already dismissed the case for lack of jurisdiction. We reverse the judgment of the Huron County Court of Common Pleas that the court lacked jurisdiction to consider appellants' claims and remand this case to the Huron County Court of Common Pleas for further proceedings. Appellees are ordered to pay the costs of this appeal.

*Judgment reversed*
*and cause remanded.*

HANDWORK, MELVIN L. RESNICK and SHERCK, JJ., concur.